IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DIANE SCHARF                          :                CIVIL ACTION

      v.                              :

HJ & VJ, INC., d/b/a THE HILTON       :
GARDEN INN and HJ & VJ, LLC, d/b/a
THE HILTON GARDEN INN and JOSHI       :
HOTEL GROUP, d/b/a THE HILTON
GARDEN INN                            :                NO. 13-4089

**MEMORANDUM OF DECISION**

THOMAS J. RUETER                                      August 16, 2016
United States Magistrate Judge

      The court held a bench trial on July 12-13, 2016 in the above-captioned personal injury case.  The parties consented to the court's jurisdiction pursuant to 28 U.S.C. § 636.  After careful consideration of all trial evidence, submissions, and arguments of counsel, the court makes the following Findings of Fact and Conclusions of Law:

I.      **Findings of Fact and Conclusions of Law on Liability**

      On July 14, 2011, plaintiff, Diane Scharf was fifty-six years old, and was employed as a corporate rehabilitation consultant for HCR Manor Care, located in Texas.  On that day, plaintiff was a guest at the Hilton Garden Inn in Allentown, Pennsylvania ("Hotel").  The Hotel was owned and operated by defendants.

      At approximately 8:45 a.m., plaintiff walked from the exit of the Hotel through the Hotel's parking lot toward her co-worker Wendy Gilbert's car.  Before reaching the car, plaintiff tripped and fell on the raised cement edge of a metal storm grate.  The asphalt parking lot surface had sunk and become depressed around the storm grate.  The portion of the cement edge of the storm grate on which plaintiff tripped was raised approximately one-inch from the

surface of the parking lot and was partially covered by asphalt, making it difficult for plaintiff to see the change in elevation from the parking lot to the storm grate.  The Hotel's parking area served multiple purposes: a walkway for pedestrians, a road for vehicular traffic, and a place for guests to park their cars.  The Hotel knew that pedestrians would walk on and near the raised storm grate.  Plaintiff did not observe and was not aware of the raised storm grate prior to falling.

Wendy Gilbert, who was waiting for plaintiff in a parked automobile, was in close proximity to where the accident occurred.  Ms. Gilbert testified that she observed plaintiff trip over the raised cement edge of the storm grate, fall down on her left knee, and hit her head on the curb in front of the storm grate.  When plaintiff fell, her head struck the curb forcefully causing a laceration just above her left eye, which began to bleed profusely.  Plaintiff also suffered abrasions on her left knee and shoulder.  After a Hotel employee called for assistance, plaintiff was transported by paramedics to a nearby hospital emergency room.  At the hospital, medical personnel used six stitches to close the cut to plaintiff's head.  A CAT scan of plaintiff's head and brain was normal.

The curb, upon which plaintiff struck her head, was painted bright yellow and abutted the storm grate.  The curb enclosed a small grass-filled island which measured approximately two feet in width.  The island separated the parking area from the driveway leading to the front entrance of the Hotel.  Plaintiff intended to cross the island to enter the automobile in which Ms. Gilbert was waiting.  The perimeter of the storm drainage grate was not painted bright yellow like the curb.

Defendants did not provide warnings to pedestrians about the dangers posed by the raised storm grate.  For example, there was no sign or other warning to alert pedestrians to

the raised edge of the storm grate.  Defendants did not designate any specific path or walkway directing guests where to walk from the exit doors of the Hotel to the parking lot.  Furthermore, defendants did not plant bushes, trees or shrubbery, or erect a barrier within the grass area of the island, to prevent hotel guests from stepping over the island on their way to the parking lot.

The management of the Hotel knew that the cement edge of the storm grate was raised prior to plaintiff's accident.  Mark Raphun, who was the manager of the Hotel, walked the premises many times before the accident and knew, as early as 2010, that the edge of the storm grate was raised.  Indeed, Mr. Raphun discussed the resealing of the parking lot with the  Hotel ownership in 2010 when he began his employment because he felt that the parking lot looked old and "tired."  Defendants made no attempt to repair the defect in the storm grate by beveling the edge, by filling in the defect with asphalt or a cement patch, or by warning business invitees by, for example, painting the raised cement border of the storm grate yellow, as they did the abutting curb.

As a result of her fall, plaintiff suffered injuries, including a head laceration which required sutures, and a concussion.  She also suffered from headaches, nausea and vomiting, and a temporary loss of vision.  In addition, plaintiff suffered abrasions and bruises on her left knee and left shoulder.

Plaintiff claims defendants were negligent in allowing a dangerous condition to exist in its parking lot knowing that pedestrians may trip on the hazardous condition.  To establish negligence, a plaintiff must demonstrate: (1) the existence of a duty or obligation recognized by law; (2) a breach of the duty; (3) causal connection between the breach of duty and the resulting injury; and (4) actual loss or damage.  Krentz v. Consol. Rail Corp., 910 A.2d 20,

3

27-28 (Pa. 2006) (citation omitted).  The nature of the duty depends upon the relationship between the parties at the time of the plaintiff's injury.  Pittsburgh Nat'l Bank v. Perr, 637 A.2d 334, 336 (Pa. Super. Ct.), appeal denied, 644 A.2d 1202 (Pa. 1994) (Table).  In a premises liability action, the duty of care that a possessor of land owes to one who enters upon the land "depends upon whether [the latter] is a trespasser, licensee, or invitee."  Carrender v. Fitterer, 469 A.2d 120, 123 (Pa. 1983) (citation omitted).  At the time of the accident, plaintiff was an invitee of the Hotel.

The Pennsylvania courts have explained the duty a business owner owes to an invitee as follows:

> "It is well settled that a business owner owes a duty to an invitee 'to maintain its premises in a reasonably safe condition for the contemplated uses thereof and the purposes for which the invitation was extended.'" David by Berkeley v. Pueblo Supermarket of St. Thomas, 740 F.2d 230, 236 (3d Cir. 1984) (quoting Morris v. Gimbel Bros., Inc., 394 F.2d 143, 145 (3d Cir. 1968)).  "An invitee is entitled to expect that the [business owner] will take reasonable care to ascertain the actual condition of the premises and, having discovered it, either to make it reasonably safe by repair or to give warning of the actual condition and the risk involved therein."  Restatement (Second) of Torts § 343 (1965), comment d.  A possessor of land is "not an insurer of the visitor's safety."  Rabutino v. Freedom State Realty Co., 809 A.2d 933, 939 (Pa. Super. Ct. 2002) (citation omitted).  Rather, a possessor of land is subject to liability for physical harm caused to invitees by a condition on the land if, but only if, the possessor:
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

Daniels v. Sears and Sears Roebucks and Co., 2016 WL 5121205, at *2-*3 (E.D. Pa. Feb. 10, 2016) (citations omitted).

4

The Superior Court of Pennsylvania recently reiterated that "the duty owed to a business invitee is the highest owed to any entrant upon land.  The landowner is under an affirmative duty to protect a business visitor not only against known dangers but also against those which might be discovered with reasonable care."  Reinoso v. Heritage Warminster SPE, LLC., 108 A.3d 80, 85 (Pa. Super. Ct. 2015) (internal quotations omitted). Furthermore,

> An invitee is entitled to expect that the possessor will take reasonable care to ascertain the actual condition of the premises and, having discovered it, either to make it reasonably safe by repair or to give warning of the actual condition and the risk involved therein.  Therefore an invitee is not required to be on the alert to discover defects which, if he were a mere licensee, entitled to expect nothing but notice of known defects, he might be negligent in not discovering.  This is of importance in determining whether the visitor is or is not guilty of contributory negligence in failing to discover a defect, as well as in determining whether the defect is one which the possessor should believe that his visitor would not discover, and as to which, therefore, he must use reasonable care to warn the visitor.

Id. at 85 (quoting Restatement (Second) of Torts § 343, comment d).

As found earlier, defendants had notice of the dangers presented to pedestrians from the raised storm grate.  Defendants' Exhibit 18, an enlarged photograph of the storm grate, shows that the defect was observable from an inspection of the parking lot.  Hotel management regularly inspected the parking lot and became aware of the difference between the height of the storm grate and the adjoining asphalt prior to the accident.

Defendants argue that the defect is "trivial" and, therefore, they are not responsible for plaintiff's injuries.  "While landowners have a duty to maintain sidewalks in a reasonably safe condition, there is no duty to protect a pedestrian from any and all accidents." Waddington v. United States, 2008 WL 2522430, at *7 (E.D. Pa. June 24, 2008).  "An elevation, depression or irregularity in a sidewalk may be so trivial that the court, as a matter of law, is

bound to hold that there was no negligence in permitting it to exist." Id. (quotation omitted).

"[U]nless a defect is obviously trivial, its gravity is an issue of fact to be determined in light of

the circumstances of the particular case." Id. "This rule consistently has been applied in

Pennsylvania to sidewalks, pavements, driveways, streets, cobblestones, walkways, curbs, etc."

Hall v. Hess Corp., 2013 WL 3878572, at *2 (E.D. Pa. July 29, 2013).

    In the instant case, the defect in the cement storm grate was not "trivial," so as to

relieve defendants of their duty of care to plaintiff.  The depression by the storm grate in the area

where plaintiff tripped measured approximately one-inch.  "No definite or mathematical rule can

be laid down as to the depth or size of a sidewalk depression necessary to convict an owner of

premises of negligence in permitting its continued existence." Breskin v. 535 Fifth Avenue, 113

A.2d 316, 318 (Pa. 1955).  Other factors also must be considered in addition to the depth of the

depression.  Hall, 2013 WL 3878572, at *2.  In the instant case, the cement edge of the storm

grate was covered partially by asphalt, which was the same color as the surrounding asphalt

parking lot making it difficult to spot.  The defect is located in defendants' parking lot which

receives both foot and motor vehicle traffic requiring business invitees, such as plaintiff, to look

for oncoming motor vehicles while traversing the area.  Moreover, plaintiff credibly testified that

she did not notice the elevation of the storm grate because she was fixated on navigating the

yellow painted curb which abutted the storm grate.  Considering all of these circumstances, the

court concludes that defect in the storm grate was not trivial.  See Reinoso, 108 A.3d at 87

(sidewalk having ⅝ of an inch height difference between sidewalk panels not a trivial defect as a

matter of law); Hall, 2013 WL 3878572, at *2 (defect in gas station lot where plaintiff tripped

was ⅝ of an inch deep and not trivial as a matter of law); Ozer v. Metromedia Restaurant Grp.,

2005 WL 525400, at *7 (E.D. Pa. Mar. 7, 2005) (triviality of ridge in parking lot asphalt, raised approximately 7/16 to ¾ of an inch and within six inches of the sidewalk curb was an issue for the jury to decide).  For all the above reasons, the court finds that defendants breached their duty of care to plaintiff by knowingly failing to warn of or to remedy the tripping hazard in their parking lot (i.e., the storm grate which was raised up above the level of the pavement).

The court further finds that plaintiff was not contributorily negligent on the day of the accident when she tripped on the edge of the storm grate.  Defendants do not argue that the defect in the storm grate was known to plaintiff.  Instead, they assert that plaintiff should have seen the defect and avoided it because it was an open and obvious condition.  See Carrender, 469 A.2d at 123-24 (under Pennsylvania law, a possessor of land is not liable for physical harm caused by any condition on the land that is "known" or "obvious").  As noted earlier, the storm grate was located in an area of the Hotel parking lot which was utilized by pedestrians and motor vehicle traffic.  Plaintiff, when traversing the area, needed to look for oncoming vehicles and thus did not see the defect.  Additionally, the edge of the storm grate where plaintiff tripped was splashed with asphalt which was the same color as the pavement making detection of the defect difficult, especially in light of its relatively shallow depth.  Moreover, it was reasonable for plaintiff to be looking ahead at the yellow painted curb as she approached the storm grate.  The curb was no more than two feet from the edge of the storm grate.  The court also finds that plaintiff acted reasonably in choosing the path to walk from the Hotel to the waiting car.  For all these reasons, the court will not assign any fault to plaintiff for the accident.

**II.**    **Findings of Fact and Conclusions of Law on Damages**

In this negligence action, plaintiff must show that defendants' conduct was the proximate cause of her injuries.  Hamil v. Bashline, 392 A.2d 1280, 1284 (Pa. 1978).  If plaintiff satisfies this burden of proof, she may recover the following types of damages:  (1) medical expenses; (2) past and future lost wages; (3) pain, suffering, loss of life's pleasures, disfigurement, embarrassment, and permanency of her injuries.  Gallo v. Yamaha Motor Corp., U.S.A., 526 A.2d 359, 365 (Pa. Super. Ct. 1987), appeal denied, 538 A.2d 876 (Pa. 1988) (Table).  As a result of the fall on July 14, 2011, plaintiff claims she sustained injuries to her head, including a mild traumatic brain injury, temporary vision loss, injury to her left knee requiring surgery, and lacerations, contusions, abrasions and swelling.

**A.**    **Lacerations and Abrasions to Head, Left Knee and Left Shoulder**

As stated earlier, when plaintiff tripped over the storm grate, she fell and struck the curb near the storm grate and suffered multiple cuts, bruises and abrasions to her head, left knee and left shoulder.  Plaintiff received six sutures to close the cut on her forehead, but has no visible scar.  (Defs.' Exh. 6 at 41.)  These lacerations and abrasions resolved soon after the accident.  (Defs.' Exh. 14 at 40.)  Plaintiff is entitled to reasonable compensation for the lacerations and abrasions she suffered as a result of the accident on July 14, 2011.

**B.**    **Vision Loss**

Plaintiff lost vision in her left eye for "a short period of time when she fell." (Pl.'s Exh. P.)  Plaintiff is entitled to reasonable compensation for this temporary loss of vision.

C.      Knee Surgery

Plaintiff seeks compensation for a tear in the medial meniscus in her left knee which caused her to undergo arthroscopic surgery on May 30, 2013.  However, plaintiff testified in a prior trial deposition on February 1, 2012, that she had no ongoing orthopedic complaints from the injury.  It was not until April of 2013, almost two years after the accident, that plaintiff sought treatment from an orthopedic specialist for her left knee.  Plaintiff saw Dr. Joseph Zabiliski, to whom she reported that she had "right knee pain for several months."  (Pl.'s Exh. R at 5.)  Later in May of 2013, plaintiff reported that she had "left knee pain for several months." Importantly Dr. Zabiliski's records reflect that plaintiff denied any history of trauma to the left knee.  Dr. Zabiliski performed arthroscopic surgery on the left knee on May 30, 2013.  Id. at 3. Dr. Zabiliski did not causally relate the May 30, 2013 arthroscopic surgery to the July 14, 2011 accident.

Dr. Noubar Didizian examined plaintiff on January 31, 2012 at the request of her employer.  Dr. Didizian testified that plaintiff had no orthopedic complaints at the time of his examination.  (Defs.' Exh. 13.)  Dr. Didizian also opined that plaintiff had not exacerbated her pre-existing rheumatoid arthritis as a result of the fall.  Id. at 33, 36-37.  Dr. Ira Sachs examined plaintiff on May 23, 2013, and opined that the 2013 arthroscopic knee surgery performed by Dr. Zabiliski was unrelated to the accident of July 14, 2011.  (Defs.' Exh. 15 at 12.)  He further testified that no further orthopedic treatment was indicated, reasonable or necessary as any orthopedic injuries from the July 14, 2011 fall had resolved.  (Defs.' Exhs. 14 at 40 and 15 at 12.)

The court finds the reports of the above-named physicians to be credible and trustworthy, and accepts their opinions that any problems plaintiff experienced with her left knee

9

are unrelated to the accident on July 14, 2011 and, therefore, plaintiff is not entitled to any
compensation for the issue with the left knee.

**D.    Head Injury**

As a result of the fall, plaintiff suffered a concussion.  She did not lose
consciousness, see Pl.'s Exh. Q at 12, but she immediately experienced headaches, nausea and
vomiting.  On August 15, 2011, plaintiff was examined by Dr. Jeremiah Lanford, a neurologist in
Round Rock, Texas.  (Pl.'s Exh. S.)  Plaintiff's primary physician made the referral.  Dr. Lanford
noted that plaintiff related that for a few weeks after the fall, plaintiff "had a post concussive
syndrome consistent with headache, photosensitivity, . . . and vertigo."  Id. at 1.  Plaintiff
reported that these conditions subsided, but "she still continues to have minimal headaches and
dizziness," and "notices difficulty with concentration at times."  Dr. Lanford found that
plaintiff's "[s]peech is spontaneous and fluent, without dysarthria.  Naming, repetition,
calculations, concentration, alertness, orientation, immediate and delayed recall, and fund of
knowledge are intact.  There are no language or cognitive deficits."  Id. at 2.  Dr. Lanford
concluded that plaintiff's neurological examination "is unremarkable and imaging studies have
been normal."  Id.  The physician did not place any restrictions on plaintiff's activities.

From October 2011 to March 2012, plaintiff was treated by Dr. Hana
Aubrechtova, a neurologist in Austin, Texas.  Dr. Aubrechtova diagnosed plaintiff with post-
concussion syndrome.  Id. at 14.  Dr. Aubrechtova reported that plaintiff complained of
headaches and intermittent mild vertigo.  Id. at 15.  The physician further noted that most patients
fully recover from post-concussion syndrome within six months.  Id. at 61.  Dr. Aubrechtova
found that the MRI of plaintiff's brain was normal.  Id. at 14.  After the first visit, Dr.

10

Aubrechtova reported that plaintiff had a very good prognosis for recovery and did not

recommend any limitations on plaintiff's activities.  After seeing plaintiff on March 27, 2012, the

physician found that all of plaintiff's symptoms had improved.  Id. at 21-22, 27.  Dr.

Aubrechtova found that plaintiff could return to work with no restrictions, other than no travel by

airplane, as of March 27, 2012.  Id. at 21-22.

      After moving to Cape Cod, Massachusetts, plaintiff saw neurologist Dr. Sean

Horrigan on September 19, 2013.  Dr. Horrigan concluded that plaintiff suffered from "tension

headaches."  (Pl.'s Exh. U at 3-4.)  He recommended that plaintiff see a neuropsychiatrist for a

formal evaluation, and recommended the names of two neuropsychiatrists to plaintiff.  Id. at 3.

Plaintiff never followed up with these referrals or for a formal examination by a

neuropsychiatrist.  Dr. Horrigan made the following findings as to plaintiff's mental status:

> Fully oriented to person, place, time . . . alert and attentive throughout interview
> and exam, able to follow complex commands . . . long-term memory appropriate
> with conversational testing, fund of knowledge appropriate with conversational
> testing, 2/3 recall after 3 minutes, able to calculate complex math, able to spell
> WORLD forwards & backwards . . . speech fluent and appropriate, no appreciable
> dysarthria, [a]ffect appears appropriate, sometimes tangential, easy to redirect.

Id.

      On September 14, 2014, plaintiff was seen by Dr. Douglas Katz in Boston,

Massachusetts at the request of her workers' compensation attorney.   Dr. Douglas Katz opined

that plaintiff has persisting problems and symptoms arising out of the injury including headache,

dizziness, word-finding problems and other cognitive impairments.  (Pl.'s Exh. W at 4.)  In

contrast, a neurologist retained by the workers' compensation carrier, Dr. Paul Shipkin, who

examined plaintiff at an earlier date, stated in his report dated January 31, 2014, that "Ms. Scharf

is neurologically intact and fully capable of resuming her former occupation on a full time basis

without restrictions - - - [and] requires no further medical care referable to 7/14/11 and has fully

recovered." (Defs.' Exh. 6 at Exh. 2.) Dr. Lee Harris, another neurologist retained by the

workers' compensation carrier, examined plaintiff on May 23, 2013 and found plaintiff "to be

fully recovered from the work injury of July 14, 2011 and capable of returning to pre-injury

employment without restriction or limitation." (Defs.' Exh. 8 at 8.) Finally, Dr. Richard Katz, a

neurologist retained by defendants in this litigation, examined plaintiff on May 2, 2014, and he

concluded that plaintiff "requires no further diagnostic or therapeutic modalities in any way

related to the incident and can pursue all chosen activities - vocational or avocational without

restriction - and particular attention is directed to ability to resume all activities from just before

the accident." (Defs.' Exh. 9 at 11.) Finally, in support of her claim for damages for the head

injury, plaintiff presented the testimony of Jessica Langlois, who was plaintiff's supervisor while

plaintiff worked as a case manager at Eagle Pond in Massachusetts from September to October

2012. Ms. Langlois testified that plaintiff's employment at Eagle Pond was terminated because

she was "unorganized" in her "thinking and action." See Langlois Dep. (6/30/16) at 16.

      The court has carefully considered all of this evidence. The court finds that

plaintiff did suffer post-concussion syndrome after the July 14, 2011 accident. The court further

concludes that she suffered recurring headaches, dizziness, nausea and vomiting after the

accident, but that any symptoms related to the July 14, 2011 accident were fully resolved by

March 27, 2012, eight months after the accident. The court also finds that plaintiff was fully

capable of returning to employment within her field by March 27, 2012. This conclusion is

supported by plaintiff's own treating neurologists who examined plaintiff shortly after the

accident, Drs. Lanford and Aubrechtova, as well as by the weight of the non-treating expert opinions offered in the trial of this matter.

###### E.      Medical Expenses

The parties agree that plaintiff's claim for medical expenses amounts to $27,387.75.  See Defs.' Pretrial Mem. Exh. E.  A portion of these expenses relate to the surgery to plaintiff's left knee, which is not causally related to the accident at the Hotel for the reasons stated above.  Medical expenses related to plaintiff's knee surgery are not compensable in this litigation and must be deducted from the requested damage award for medical expenses. Additionally, the court finds that there are no future medical expenses related to this accident.

###### F.      Wage Loss

As noted above, plaintiff is entitled to eight months of wage loss, from the date of the accident to March 27, 2012.  Prior to the accident, plaintiff was earning $105,000 salary per year.  See Pl.'s Pretrial Mem. at 8 n.2.  Thus, plaintiff is entitled to damages for lost wages in the amount of $70,000.[1]

###### G.      Award for Pain and Suffering, Loss of Life's Pleasures, Loss of Vision and Embarrassment

There is no doubt that for the eight months it took for plaintiff to fully recover from the injuries she sustained as a result of the accident, plaintiff suffered from frequent headaches, dizziness, and aches and pains from the lacerations, abrasions and bruises.  In

---

[1]      The court notes that plaintiff lost this employment shortly after the accident due to a reduction in force lay off by her employer, and not due to injuries from the accident.  However, the court finds that plaintiff would have been able to obtain comparable employment within the locality during the eight month period following the accident, but was prevented from doing so by the injuries she suffered from the accident.

addition, plaintiff suffered from significant emotional distress as a result of her physical injuries, as well as temporary loss of vision, although it was very brief.  The court will award plaintiff a total of $ 80,000 for these injuries.

**H.     Total Award of Damages**

For all the above reasons, the court awards the following damages to plaintiff:

1.     Past Medical Expenses... . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 16,551.92[2]

2.     Wage Loss. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 70,000.00

3.     Pain and Suffering, etc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 80,000.00

Total Award of Damages. . . . . . . . . . . . . . . . . . . . . . . . . . $ 166,551.92

An appropriate Judgment Order will be entered in the above amount.

BY THE COURT:

/s/ Thomas J. Rueter
THOMAS J. RUETER
United States Magistrate Judge

---

[2]      As detailed above, this court found that the problems with plaintiff's left knee are unrelated to the July 14, 2011 accident and, therefore, plaintiff is not entitled to compensation for expenses incurred for treatment to her left knee.  The court also found that all of plaintiff's symptoms related to the July 14, 2011 accident were fully resolved by March 27, 2012.  Plaintiff's counsel stated that he would supplement plaintiff's proposed findings of fact and conclusions of law with an exhibit summarizing plaintiff's medical expenses in such a way as to permit this court to discern which expenses related to which injury, e.g. neurological injury versus orthopedic injury.  Counsel did not provide such a summary.  In order to determine the medical expenses compensable herein, the court utilized the medical payment chart attached as Exhibit E to plaintiff's pretrial memorandum (Doc. No. 52), and only awarded medical expenses incurred through March 27, 2012.